Daniel T. Jones
Gale R. Gustafson
Fernand J. Terrones
GUSTAFSON LAW OFFICES
400 South Main Street, Suite 101
Conrad, MT 59425
Telephone: (406) 278-7521
Fax: (406) 278-7522
djones@glo.law
Attorneys for Plaintiffs



MONTANA EIGHTH JUDICIAL DISTRICT COURT, CASCADE COUNTY

*********************************************************************

| | | |
|---|---|---|
| KARI ANDERSON, AND ON BEHALF OF HER MINOR CHILD, L.A., AND MAKAYLA ANDERSON, | * * * * | **CDV-19-0811** Cause No. _____ JOHN A. KUTZMAN |
| Plaintiffs, | * * | |
| | * * | COMPLAINT AND |
| vs. | * * | JURY TRIAL DEMAND |
| | * | CV-20-40-GF-BMM-JTJ |
| MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES, A MONTANA STATE AGENCY, THE STATE OF MONTANA, JACQUI POE, INDIVIDUALLY AND AS A DPHHS EMPLOYEE, JANE DOES I-V, AND JOHN DOES VI-X | * * * * * * * | |
| Defendants. | * * | |

*********************************************************************

COMES NOW, the Plaintiffs, Kari Anderson, and on behalf of her Minor Child, L.A., and her daughter, MaKayla Anderson, by and through their undersigned attorneys, allege the following as a basis for their claims for relief against the Defendants.

**JURISDICTION, VENUE & PARTIES**

1. Venue is proper in the Eighth Judicial District Court for the State of Montana, Cascade County, because a substantial part of the events or omissions giving rise to the claims occurred in Cascade County.

2. Plaintiff Kari Anderson ("Kari") was at all times material herein married to Mike Anderson ("Mike") and they are the biological parents of L.A. ("L.A."), born XX/XX/2011

3. Kari is the biological mother of MaKayla Anderson ("MaKayla") and is the step-mother of Mike's minor sons, J.A. and M.A.

4. Plaintiffs are residents of Fergus County, Montana.

5. Defendant Department of Public Health and Human Services ("DPHHS"), an administrative agency within the executive branch of the government of the State of Montana, also a Defendant herein, is seated in Lewis and Clark County, State of Montana.

6. Defendant Jacqui Poe ("Jacqui") was employed by DPHHS as a Child Protection Specialist/Social Worker and at all relevant times acted under the authority of DPHHS. Jacqui's office was located in Livingston. DPHHS's office in Livingston was closed due in part to Jacqui's conduct.

**INTRODUCTION**

7. The claims alleged herein all arise as a result of the willful disregard for the truth and the intentional misconduct of DPHHS and its agent, Jacqui.

8. On November 30, 2014, Mike, with a breath alcohol content of 0.290, wrecked his vehicle with M.A., MaKayla, and J.A. in it. As a result, Mike was charged and plead guilty to felony criminal endangerment and misdemeanor driving under the influence.

9. Kari was not present at the time of the wreck. Shortly before Mike's wreck Mike had assaulted Kari by hitting her in the head with a television. Mike then fled and left Kari behind.

10. Because Mike's wreck involved MaKayla, M.A., and J.A. DPPHS's Division of Child Protective Services ("CPS") took notice and intervened. CPS assigned Jacqui to the Andersons' case.

11. Kari was initially excited by the prospect of getting help from CPS, especially because her stepson, M.A., had struggled for years with mental health related issues since he was three (3) years old when Kari arranged for his continuous counselling and therapy. Kari and Mike had not been able to get the additional resources they had needed to get M.A. further counseling that he very badly needed, and the involvement of CPS appeared to Kari to be an answer to M.A.'s challenges.

12. In February of 2015, one of Jacqui's first acts as the social worker overseeing the Anderson family, was to forge the signature of Robin Peters ("Robin"), Kari's mother, who was being designated as a safety resource in the childcare plan.

13. This would not be the last instance of Jacqui forging signatures to obtain what she would represent to be "voluntary" consent. In every instance, however, Jacqui knew that her forgery was false. Jacqui knew that it was necessary for the plan to be effective. She also knew that her forgery would be relied upon by those to whom she would present it. Jacqui's position, in conjunction with the forged signatures, ensured that to whomever she would present the fraudulent signatures,

they would be relied upon to systematically abuse the Plaintiffs' rights.

14. Kari soon found out that her hope and trust had been misplaced and that she had actually just started down a road of relentless harassment and retaliation by Jacqui.

## The Rape and Betrayal

15. On or about April 2, 2015, Kari discovered a rape key that M.A. had created. M.A. was only 11, but to Kari's shock, he had written in crayon step-by-step instructions for capturing, raping and murdering his step-sister MaKayla and half-sister L.A.

16. Kari immediately contacted Jacqui for her help with this bizarre behavior of her stepson, M.A. Kari had no idea what to do with M.A.'s creation. Since CPS's mission is "Keeping Children Safe and Families Strong", Kari assumed that by contacting Jacqui she would get the immediate help that she needed for the safety and preservation of her family.

17. This was particularly concerning because, as Kari had shared with Jacqui repeatedly, M.A. had been diagnosed with Reactive Attachment Disorder and Oppositional Defiant Disorder. Reactive Attachment Disorder is a serious and rare disorder that inhibits children from establishing lasting, healthy bonds with parents or caregivers. Oppositional Defiant Disorder is a behavioral disorder that results in children acting uncooperative, defiant and hostile towards peers, parents and caregivers.

18. Surprisingly, Jacqui could see no reason to act with haste. So she scheduled a family engagement meeting for almost one month later. Kari accepted Jacqui's instructions and on April 30, 2015, Kari, Mike, Jacqui, Joe Albro (Family Engagement Facilitator), Hettie Wortelboer (child therapist), and Lisa Macameo had a family engagement meeting. Jacqui was not able to bring the rape key to the meeting because she had accidentally lost it.

19. At this April 30, 2015 family engagement meeting, Jacqui told the entire group that M.A.'s handwritten rape and murder manifesto was normal behavior for an 11-year-old boy. Jacqui suggested that perhaps Kari was treating her step-son, M.A., unfairly. Jacqui assured everyone that there was "no cause for concern."

20. On May 9, 2015, the day before Mother's Day, M.A. raped, at knifepoint, his younger brother, J.A. and his 4 year old half-sister, L.A.

21. Kari, frantic and in a state of shock, called her daughters' therapist, Hettie Wortelboer ("Hettie"), for help. Hettie didn't think it was necessary to call law enforcement. Instead Hettie instructed Kari to call the CPS Hotline for help. Hettie, who is a mandatory reporter pursuant to Mont. Code Ann. § 41-3-201, did nothing else.

3

22. MaKayla, who was 15 years old at the time, was so overwhelmed by the sickeningly disturbing events of May 9, 2015 that she ended up hospitalized at Shodair Children's Hospital in Helena, Montana.

23. Mike, who was drinking himself into a stupor, hid in the family's travel trailer. He later emerged to throw Kari, J.A. and L.A. out of their home and onto the streets. He was certain that the three of them must have fabricated the whole incident.

24. Kari, J.A. and L.A., were effectively homeless due to Mike's misplaced anger and Jacqui's inaction. Thankfully, Kari's mother offered to pay for the three of them to live in a hotel in Livingston. By the end of May, Kari was able to find a rental house to move into. Meanwhile, Jacqui had determined that she approved of J.A. living with Kari because Kari could keep him safe. Jacqui could have concerned herself with the children's safety and intervened on their behalf in early April when Kari first reported M.A.'s rape key. Instead, after the kids are raped at knifepoint, Jacqui passively acknowledges that the kids are probably better off living in a hotel with Kari than they were living under the same roof as M.A. Jacqui did not even bother to report the May 9, 2015 forcible rapes to her husband, a Police Officer with the Livingston Police Department.

25. Mike and M.A. continued to live together. Mike kept feeding his alcoholism. Jacqui couldn't be bothered to even speak with M.A. for seven months.

## Jacqui & CPS Blame Kari

26. Jacqui needed to justify her inaction. Kari was vulnerable because of her emotional and financial instability. In the latter part of May, 2015, Jacqui met with Kari. Jacqui told Kari that the rapes had been Kari's fault because Kari had fought with Mike in front of the kids. Jacqui threatened Kari. Unless Kari would sign a new "voluntary" protective services agreement admitting that M.A.'s conduct had been Kari's fault, Jacqui would simply remove L.A. from her care. The threat worked. Kari couldn't imagine her life without her children. Kari signed the agreement under coercion.

27. Jacqui had found Kari's weakness. Kari suffered from the same weakness that every parent suffers. She loved her children. Jacqui had figured out that she could manipulate Kari into doing anything if she threatened to take Kari's kids from her. This would not be the last time that Jacqui exploited Kari's love for her children.

28. It was not until January 1, 2016, that Kari's stepson, M.A., was charged with sex crimes for raping his youngest brother, J.A., and sexually assaulting his half-sister, L.A., on May 9, 2015.

4

29. Between the death of Kari's father on February 19, 2016 and his funeral on March 12, 2016, Jacqui kept calling Kari threatening to take Kari's minor children away from her immediately unless Kari called Jacqui back right away.

30. Then, in April 2016, while Kari was hospitalized from April 1-5, 2016 for elevated high blood pressure (210/110), serious depletion of white blood cells, uncontrollable nausea, and lethargy, Jacqui incessantly called the hospital to demand that Kari move from Livingston, Montana by April 20, 2016, or she would file a Youth In Need of Care petition against Kari as well as request temporary legal custody of Kari's minor children. Jacqui's demand eventually caused Kari to still be away from her minor child, MaKayla, who was attending high school in Livingston, because Jacqui ordered Kari to move to Belgrade, Montana for supervision or else she would take L.A. away from Kari.

31. Jacqui's calls became so annoying to the hospital where Kari was being treated that her treating physician ordered Jacqui to stop calling Kari while she was receiving inpatient treatment at the hospital.

32. On April 6, 2016, Jacqui followed through with her threat and filed a Youth In Need of Care Petition against Kari and requested temporary legal custody of Kari's minor children… particularly her youngest daughter, L.A.

33. Jacqui filed the petition because she based her unfounded belief that Kari harmed M.A., predicated upon his fabricated allegation that Kari sexually abused him in order to try to mitigate his consequences of having sexually assaulted his brother, J.A. and his half-sister, L.A.

34. The stepson accuser, M.A., even accused his birth mother, Jill Henry Letter, of sexually abusing him, but Jacqui never went after his birth mother. Instead, she went after Kari because of her faulty belief and because she simply did not like the fact that Kari kept pointing out Jacqui's blatant malfeasance for not doing anything when Kari told Jacqui about her stepson's rape key and requested her help.

35. Jacqui went so far as to state her unfounded belief in such a way as to sound like evidence during Court Hearings in order to retaliate against Kari for pointing out Jacqui's wrongdoing of ignoring the rape key disclosure and Kari's request for help.

36. On April 19, 2016, Jacqui again threatened Kari via email that if she did not agree to CPS' proposed protective service plan, then she would have to remove Kari's minor children from her.

37. During the entire time the Youth In Need of Care cases were pending Jacqui maliciously prosecuted Kari.

38. Jacqui systematically made Kari's life hell by withholding resources from Kari while

5

simultaneously and proactively offering state funded reimbursements and vouchers to Mike. Jacqui even personally delivered free groceries to Mike at his apartment.

39. On May 10, 2016, Jacqui contacted Kari at 4:45 p.m. at her job in Bozeman, Montana, where she was compelled to move by Jacqui, ordering her to come to Livingston, Montana and have a SCRAM bracelet placed on her by 5:00 p.m. that same afternoon or she will remove Kari's minor children from her until she gets a SCRAM bracelet. The SCRAM bracelet order was unfounded and arbitrarily issued by Jacqui. Kari's compliance with Jacqui's demand was impossible because of the time it was made and due to the distance between Bozeman and Livingston. Thus, Kari did not have a SCRAM bracelet by 5:00 p.m.

40. Consequently, Jacqui had Kari's minor child, L.A., removed from her mother's care over that Mother's Day weekend until Kari got a SCRAM bracelet which Kari was unable to get until May 13, 2016, the Monday after Mother's Day, at which time Kari regained custody of L.A.

41. Jacqui had L.A. placed with Mike who was sharing a place with a convicted sex offender. Kari pointed this obvious safety concern out to Jacqui and Livingston Police Sergeant, Joseph Harris, Jacqui's husband, but to no avail...Sergeant Harris also ignored Kari's request for a welfare check on L.A. while she was living with Mike and Mike's convicted sex offender roommate.

42. Jacqui also gave Mike Kari's personal vehicle to drive their minor child around even though Mike had a suspended/revoked driver license and was facing contempt of court charges for bail jumping in his criminal case.

43. Furthermore, Jacqui misrepresented to the Youth In Need of Care Court that Kari was harming L.A. by being around Mike, but, ironically, Jacqui placed L.A. with Mike and his sex offender roommate.

44. Moreover, Kari's inability to comply with Jacqui's May 10, 2016 SCRAM bracelet order was the basis for Jacqui to get another involuntary plan drawn up against Kari by continuing the temporary legal custody order.

45. On November 9, 2016, Jacqui's husband, Livingston Police Sergeant Harris, took Kari into custody for interrogation because Kari's stepson, M.A., while in custody for his sex crime case, asserted Kari sexually abused him during an October 2016 forensic interview.

46. During the November 9, 2016 interrogation, Police Sergeant Harris told Kari he believed M.A. was lying and believed Kari did not do anything to him, but, as a matter of protocol, had to question her because of M.A.'s fabricated allegation(s) against her. Later that day, Kari talked to Jacqui face-to-face about her Jacqui's husband's interrogation of M.A. and Kari. In particular they discussed Sergeant Harris' statement to Jacqui that he believed Kari's stepson, M.A., was lying

and that Kari was innocent.

47. Jacqui assured Kari that law enforcement does not get to make the decision of whether to prosecute. Jacqui went on to explain to Kari that Jacqui still believed Kari sexually abused her stepson, M.A. Kari, horrified, offered to submit to a lie detector test. Jacqui could not be persuaded otherwise and ignored Kari's offer.

48. It got worse in November 2016 when Jacqui maliciously sanctioned Kari for alleged SCRAM bracelet violations on June 10 and 11, 2016 even though Kari did not have on a SCRAM bracelet until sometime after June 18, 2016, and the alleged violations were under another person's name. It was not until sometime after June 18, 2016, that Kari was given a SCRAM bracelet for being charged with felony criminal endangerment and misdemeanor driving under the influence (1st Offense).

49. As a result of Kari's mid-June 2016 charges, Jacqui ordered Kari to wear a SCRAM bracelet and submit to random UAs and remote breath samples for 18 months.

50. Ironically, Jacqui never placed Mike on a SCRAM bracelet during the Youth In Need of Care Case despite the fact that Mike also crashed his vehicle with Kari's and his minor children in it and him being convicted of felony criminal endangerment and misdemeanor driving under the influence pursuant to his guilty pleas.

51. On November 24, 2016, Kari had Thanksgiving Dinner in Lewistown with Mike.[1] Jacqui had pre-approved Mike's Thanksgiving visit. Jacqui later falsely testified that she had never approved Mike's visit.

52. After Thanksgiving Dinner, Kari was driving Mike and L.A. back to their home in Livingston when she was pulled over for a vehicle light being out. During the stop, the peace officer arrested Mike because he had an outstanding arrest warrant resulting from alcohol use that was in violation of his terms of probation. The peace officer then allowed Kari to proceed home with her daughter, L.A.

53. During the weekend of November 26-27, 2016, Kari's SCRAM bracelet showed a false positive for which she subsequently submitted to a "within-80-hours-UA". The "within-80-hours-UA" showed negative for traces of alcohol for that weekend.

54. Despite the false positive, Jacqui took the SCRAM bracelet error as an opportunity to interfere with Kari's right to live with her minor children together without governmental interference. On November 30, 2016, Jacqui removed L.A. from Kari's home and placed L.A. with Kari's mother,

---

[1] Other family members were present as well.

Robin Peters, in Lewistown, Montana. This removal of L.A. from Kari's home in Livingston was arbitrarily and unjustifiably done since Kari was in compliance with her CPS treatment plan.

55. Because of Jacqui's unjust and abusive discretionary actions, Kari moved in with her mother in Lewistown. This is another example of Jacqui offering Kari the options of complying with arbitrary and unjustified conditions, or, abandon her daughters.

56. This was the second physical relocation that Jacqui imposed upon Kari. And, just as was the case in the prior move, Jacqui refused Kari any resources for having to make the move. Kari lost her job and her apartment in Livingston as a result. Her only alternative was the loss of her daughters.

57. Traci L. Shinabarger, Chief Child and Family Ombudsman, Division of Criminal Investigation, Department of Justice, State of Montana, determined CPS' actions, by and through Jacqui, violated Child & Family Services Policy 201-2 because additional services were not considered for the SCRAM error nor was the safety plan updated in response to the SCRAM error.

58. Jacqui then began working on persuading Park County Attorney Kathleen Carrick to charge Kari with felony sexual assault of her step-son, M.A. Jacqui was successful in her attempt and on December 13, 2016 Park County Attorney Kathleen Carrick filed an Information alleging Kari committed felony sexual assault against her step-son, M.A.

59. Consequently, Kari was subjected to 4 weeks of jail time. All due to Jacqui convincing the Park County Attorney's Office to file an Information against Kari based on the unfounded allegations of Kari's step-son, M.A., which Jacqui whole-heartedly embraced notwithstanding her own husband's conclusion to the contrary. Kari remained in the Park County Detention Center through Christmas and New Year's. She was not released until January 12, 2017.

60. When Kari was in jail for the sex crime charge, her SCRAM bracelet had to be removed per Park County Detention Center's policy of prohibiting devices on inmates. Nevertheless, Jacqui reprimanded Kari with a non-compliance for the bracelet being involuntarily removed by peace officers at the Park County Detention Center. Jacqui also reprimanded Kari for an alleged UA violation even after it was proven by the test facilitator, Fergus County Nurse Kathy Anderson, that the UA was altered after it was submitted to CPS in Park County, which established that Kari had not committed any violation. Despite the UA exoneration, Jacqui reprimanded Kari for the non-UA violation which further enhanced her pending Youth In Need of Care Case against Kari.

61. Finally, on May 3, 2017, Park County Attorney Kathleen Carrick filed a motion to dismiss, **without prejudice**, the felony sex crime charge against Kari.

62. Kari was never informed of the lack of evidence by the Park County Attorney which prompted her to file the motion to dismiss. Nevertheless, Kari knew Jacqui used the Park County Attorney's

8

Office as a means to attack Kari with a sex crime charge with the hopes of silencing her because Kari kept questioning Jacqui about her illegal, unethical, and most inappropriate treatment of her and her minor children.

63. Following the dismissal of Kari's criminal case, the DOJ Ombudsman, Traci L. Shinabarger, made findings that Jacqui continued to mislead the Youth In Need of Care Court and that Jacqui set arbitrary and unreasonable expectations upon Kari.

64. Notably, Ombudsman Shinabarger found twice, on December 12, 2017 and July 20, 2018, that Jacqui violated Sections 41-3-102, 41-2-423, 41-3-422, MCA; and Child & Family Services Division Policies 301-1, 303-1, and 402-5 for the following reasons:

   a. Even after Kari's criminal charge was dismissed and a psychosexual evaluation of Kari was completed and the results thereof were favorable to Kari, nonetheless, Kari was required to continue with her therapy and supervision in her Youth In Need of Care Case, because Jacqui testified in Court that she maintained her belief that Kari sexually abused her stepson, M.A.

   b. Jacqui also testified and misrepresented to the Court that Kari's alleged comment to her minor child, L.A., about her criminal case rendered Kari's minor child, L.A., unsafe and required extension of L.A.'s temporary legal custody with Kari's mother, Robin Peters, a next-of-kin placement. Jacqui conveniently left out any mention of Mike's non-law abiding behavior and treatment plan violations. She even left out information that Kari's minor child, L.A., was doing well.

   c. Jacqui misrepresented to the Court that she, Jacqui, had no knowledge of Mike's substance use relapse while the minor child, L.A., was in his care. However, three (3) people with knowledge of Mike's substance use relapse alerted Jacqui while the minor child was in his care (Ombudsman Shinabarger was in Court to witness Jacqui misrepresent numerous topics and actions mentioned herein about Kari to the Court).

   d. Jacqui misrepresented to the Court that the treatment of Kari was insufficient despite two (2) therapists' findings to the contrary. Jacqui attempted to dictate to the therapists the type of therapy methodology to be used and unilaterally changed the therapists' recommendations multiple times;

   e. Jacqui misrepresented to the Court that Kari would not communicate with her despite overwhelming email evidence to the contrary;

   f. Jacqui had Kari's minor child, L.A., transported for a closure session with her prior therapist several months after the minor child had a last session with her prior therapist and had moved to Lewistown;

9

g. CPS's treatment, by and through Jacqui, of Kari and Mike continued to be inconsistent. Jacqui required Kari to perform additional treatment tasks despite Kari's treatment providers' stating that no additional tasks were warranted;

h. Jacqui did not assist Kari with a daycare application or payments, but did so for Mike.;

i. Jacqui did not provide transportation to and from therapy appointments for the minor child, but provided transportation for Mike;

j. Jacqui provided Mike with more visitation time and assistance than Kari received;

k. Jacqui did not require additional services, nor adequately document services given Mike post relapse, but did so for Kari;

l. Kari, via her legal counsel, moved the Court to dismiss her Youth In Need of Care Case on March 21, 2018, and it was not dismissed until May 14, 2018; and

m. Throughout Kari's time with CPS, Kari was never given an opportunity to have her witnesses present their testimony in Court.

n. The full reports of Ombudsman Traci L. Shinabarger, are with the Division of Criminal Investigation at the Montana Department of Justice.

65. Jacqui also violated the face-to-face contact requirement per Child & Family Services Policies 402-5 and 6 by keeping Kari's minor child, L.A., away from her a majority of the time. For nine (9) months Jacqui did not visit Kari and L.A. while they were staying with L.A.'s maternal grandmother, Robin Peters, in Lewistown.

66. Despite concerns at the time that Jacqui was biased against Kari, Jacqui maintained oppressive control over Kari and her minor child, L.A., by shuffling them around Montana on command, threatening Kari that she would lose L.A. if she did not comply with her commands. Instead of requesting courtesy supervision of them in another CPS Region, Jacqui maintained control over Kari and L.A. from a different CPS Region, which was in violation of Child & Family Services Policies 402-5, 402-6, and 502-2.

67. Jacqui continued to terrorize Kari despite the fact that Kari did UAs, SCRAM bracelet, remote breath tests 4 times a day, and three counseling sessions a week without any violation for 18 months. Yet, Jacqui kept ordering more and more treatment for Kari.

68. Jacqui would not take Kari off of the SCRAM bracelet despite the fact that Kari was compliant with her treatment nor when Kari's doctor told Jacqui that the SCRAM bracelet needed to be taken off Kari for the medical reason of healing because Kari's psoriasis was causing her a great deal of pain, which was aggravated by the bracelet.

69. On December 23, 2017, Mike was arrested for beating a dog and threatening his neighbor. Despite

the fact that Mike was arrested a few days prior, on December 26, 2017, Jacqui demanded Kari return L.A. to Mike or else she will take L.A. away from her and cancel future visits between them.

70. Jacqui asserted in another drawn up safety plan that Kari was out of control with her drinking, which was not true because Kari was compliant with her CPS treatment plan for the entire 18 months she was under alcohol monitoring.

71. Jacqui kept terrorizing Kari all because Jacqui unjustifiably believed Kari sexually abused her stepson despite the fact that Kari's criminal charge was dismissed and the stepson's allegation was unfounded. Nevertheless, Jacqui's twisted belief caused her to make Kari's life a living hell, which also grievously affected Kari's minor children, L.A and MaKayla.

72. The mission of CPS is to promote safe and healthy families and protect children and vulnerable adults from abuse. Yet, Jacqui's actions were the antithesis of CPS' mission because she abused Kari by sanctioning her for pretext reasons just to torment her because she believed Kari sexually abused M.A.. Jacqui also invariably hurt Kari's minor children emotionally by having them witness her abuse of their mother and being shuffled around Montana into safe and unsafe living situations as a result of Jacqui's torturous actions against their mother, Kari.

## CLAIMS

## COUNT ONE: (Negligence – Montana Law – Official Capacity)

73. Plaintiffs hereby incorporate by reference each of the allegations set forth above as if more fully set forth herein.

74. CPS and its agent, Jacqui, owed a duty to Kari and her children to perform their duties with reasonable care and to protect and serve the public, including Kari and those similarly situated.

75. CPS' authority to intervene in people's lives is wholly statutory. Thus, CPS must strictly adhere to the specific requirements of the statutes in providing protective services to children in need of such care, including Kari.

76. CPS owed a duty to Kari to train and supervise and otherwise control Jacqui with respect to the proper and/or appropriate conduct, actions, and performance of Jacqui's duties such that she would perform her duties in a manner free from negligence with respect to Kari.

77. CPS instead allowed Jacqui to arbitrarily make up her own rules respecting Kari that trampled Kari's statutory and constitutional rights, which made Kari's life a living hell all because of its employee Jacqui's unfounded belief and vindictiveness.

78. Jacqui owed a duty to Kari to strictly adhere to the specific requirements of the statutes and CPS' policies instead of arbitrarily making up her own rules as to Kari and made her life unbearable,

which violated Kari's statutory, policy, and constitutional rights.

79. CPS' and Jacqui's acts or omissions set forth above constitute a breach of their respective duties and were the cause-in-fact and proximate cause of Kari's injuries.

## COUNT TWO: (Intentional Infliction of Emotional Distress – Montana Law – Official Capacity)

80. Plaintiffs hereby incorporate by reference each of the allegations set forth above as if more fully set forth herein.
81. CPS' and Jacqui's acts were extreme, outrageous, and unwarranted under the circumstances, which were beyond what a reasonable person would be expected to endure.
82. CPS and Jacqui intended to cause emotional distress to Kari, L.A., and MaKayla, or their acts or omissions were done in reckless disregard for the emotional distress that was certain to occur to them which was a reasonably foreseeable consequence of CPS' and Jacqui's intentional acts or omissions.
83. MaKayla, at the time while under CPS, by and through Jacqui's, temporary legal custody authority, was the victim of attempted sexual assault by her half-brother several days after Kari discovered her 11 year old stepson's rape key and brought it to CPS' and Jacqui's attention to which Jacqui casually brushed it aside as normal boy behavior. Jacqui's actions towards Kari's rape key discovery and disclosure caused MaKayla to experience severe emotional distress.
84. MaKayla has been to Shodair twice and YDI Group Home for emotional distress caused by CPS and Jacqui. She has also harmed herself and attempted suicide because of surviving the sexual assault that Jacqui could have prevented by intervening, but did not. MaKayla still has emotional scars for years to come over the shameful destruction of her mother, Kari, by CPS and Jacqui and the attempted sexual assault against her by her half-brother, M.A.
85. L.A. was sexually assaulted by her half-brother, M.A., the very act Kari tried to prevent by bringing the discovered rape key to CPS' and Jacqui's attention, but to no avail. She was also illegally removed on various occasions as alleged above and displaced on various occasions when CPS and Jacqui forced moves, removals, and arrests against Kari. L.A. was forced to witness her mother, Kari, be maliciously prosecuted by CPS, by and through Jacqui. L.A. is in therapy and will require years of therapy for the emotional distress Jacqui caused her directly and indirectly because of the sexual assault she experienced from her half-brother, M.A., which her mother attempted to prevent, and the unwarranted disruption of their family.
86. The shock and mental anguish from CPS' and Jacqui's acts or omission as set forth above

constitute the cause-in-fact and proximate cause of Plaintiffs' injuries, including and but not limited to, physical suffering, severe emotional distress, loss of sleep, anxiety, depression, fear, anguish, and despair.

## COUNT THREE: (Negligent Infliction of Emotional Distress – Montana Law – Official Capacity)

87. Plaintiffs hereby incorporate by reference each of the allegations set forth above as if more fully set forth herein.
88. CPS' and Jacqui's acts were extreme and outrageous and unwarranted under the circumstances, which were beyond what a reasonable person would be expected to endure.
89. CPS and Jacqui intended to cause emotional distress to Kari, L.A., and MaKayla or their acts or omissions were done in reckless disregard for the emotional distress that was certain to occur to them which was a reasonably foreseeable consequence of CPS' and Jacqui's negligent acts or omissions.
90. While under the supervision of CPS, by and through Jacqui's, temporary legal custody authority, MaKayla was the victim of attempted sexual assault by her half-brother, M.A., several days after Kari discovered her stepson's rape key and brought it to CPS' and Jacqui's attention to which Jacqui casually brushed it aside as normal 11 year old boy behavior. Jacqui's responses towards Kari's rape key discovery and disclosure caused MaKayla to experience emotional distress.
91. MaKayla has been to Shodair twice and YDI Group Home for emotional distress caused by CPS and Jacqui. She has also harmed herself and attempted suicide because of surviving the sexual assault attack that Jacqui could have prevented by intervening, but did not. MaKayla still has emotional scars for years to come over the attempted sexual assault against her by her half-brother, M.A., and the shameful destruction of her mother, Kari, by CPS and Jacqui
92. L.A. was sexually assaulted by her half-brother, M.A., the very act Kari tried to prevent by bringing the discovered rape key to CPS' and Jacqui's attention, but to no avail. She was also illegally removed on various occasions as alleged above and displaced on various occasions when CPS and Jacqui forced moves, removals, and arrests against Kari. L.A. was forced to watch her mother, Kari, be maliciously prosecuted by CPS, by and through Jacqui. She is in therapy and will require years of therapy for the emotional distress Jacqui caused her directly and indirectly because of the sexual assault she experienced from her half-brother, M.A., and the grievous disruption of her family.
93. As a result of the shock and mental anguish from CPS' and Jacqui's acts or omissions as set forth

13

above constitute the cause-in-fact and proximate cause of Claimants' injuries, including and not limited to physical suffering, severe emotional distress, loss of sleep, anxiety, depression, fear, anguish, and despair.

## COUNT FOUR: (Violation of 42 U.S.C. § 1983 – Individual Capacity)

94. Plaintiffs hereby incorporate by reference each of the allegations set forth above as if more fully set forth herein.
95. Any and all acts and omissions of Jacqui alleged herein constitute actions or omissions under the color and pretense of Montana state and federal laws and constitutions, and regulations, customs, and policies of CPS.
96. Jacqui owed a duty as an agent or employee of CPS, to protect and serve the public, including Kari and her minor children and those similarly situated.
97. Under the circumstances as they existed when M.A.'s criminal conduct caused Kari to seek the assistance of CPS, Jacqui had a duty to not commit abuses of process, not threaten Kari in CPS and criminal proceedings, and not carry out threats against Kari and Kari's minor children. Jacqui also had a duty to not retaliate against Kari because of her unfounded belief that M.A.'s unfounded allegations of child abuse by Kari were true, especially when the evidence unequivocally contradicted that belief.
98. Jacqui, acting within or without the course and scope of her employment and under color of state law, instituted and followed policies, procedures, and customs and conducted herself in such a manner which directly resulted in the objectively unreasonable abuse of process against Kari and resulting injuries to Kari for violating clearly established law, regulations, customs, and policies which a reasonable CPS employee should have known.
99. Jacqui caused Kari to be deprived of her rights, privileges, and immunities to be free from excessive punishment and unreasonable seizure and to due process and compulsory process, as those rights are secured under the Fourth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.
100. Jacqui also caused Kari to be deprived of her clearly established rights, privileges and immunities to be free from excessive interference with her family relationships as those rights are secured under the Eighth and Fourteenth Amendments of the United States Constitution.
101. Jacqui also caused Kari to be deprived of her right to speak and testify truthfully, without fear of reprisal and retaliation, in violation of the First Amendment to the United States Constitution.

102. As a direct and proximate result of the acts and omissions described herein, Jacqui is liable for damages to Kari for the deprivation of her civil rights under 42 U.S.C. § 1983.

## COUNT FIVE: (Malicious Prosecution – Montana Law – Official Capacity)

103. Kari hereby incorporates by reference each of the allegations set forth above as if more fully set forth herein.

104. Jacqui, acting in her official capacity in requesting the Park County Attorney's Office to commence a criminal proceeding against Kari and testifying against her in said criminal proceeding was instrumental in the prosecution of Kari without any probable cause a criminal charge based on false and fabricated evidence. Jacqui's own personal unfounded belief was the driving force for her to maliciously prosecute Kari.

105. When Jacqui found out that the Park County Attorney's Office was not inclined to prosecute Kari, Jacqui took it upon herself to be a witness just so Kari would get charged for a felony sex crime that never occurred.

106. After an Information was filed against Kari charging her with felony criminal sexual assault against her stepson, M.A., and Kari was arrested, Jacqui subsequently removed herself from the criminal case and proceeded to concentrate her torture of Kari in Jacqui's capacity as a CPS specialist/social worker.

107. The felony criminal sexual assault proceeding was terminated in favor of Kari when it was dismissed without prejudice on May 3, 2017.

108. As the cause-in-fact and proximate result of Jacqui's malicious prosecution against Kari, Kari suffered injury to her person and property, resulting in damages described in greater detail as set forth below.

109. Kari seeks damages and demands that her criminal charge be dismissed with prejudice as the dismissal thereof without prejudice still shows on her record as an adverse factor in obtaining and retaining substantial gainful employment and on her character.

## RELIEF REQUESTED

Wherefore, Plaintiffs pray for relief as follows:
1. That judgment be entered against the Department of Public Human and Human
2. Services in an amount to be determined at trial;
3. That judgment be entered against Jacquie Poe, individually, in an amount to be determined at trial;
4. That Defendants be punished by way of punitive damages;
5. That Plaintiffs be awarded attorney fees and costs allowed by law;

6. That Plaintiffs be allowed to recover prejudgment interest as provided by law; and

7. That, in addition, any other appropriate lawful or equitable relief.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues triable by a jury.

DATED this 20TH day of December, 2019.

Respectfully submitted,

Daniel T. Jones
GUSTAFSON LAW OFFICES
400 South Main, Suite 101
Conrad, Montana 59425
Telephone: (406) 278-7521
Facsimile: (406) 278-7522
Attorneys for Plaintiff